UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-80067-CR-SMITH/MAYNARD

UNITED STATES OF AMERICA,

v.

MICHAEL ANTHONY HOOKS, JR.,

    **Defendant.**
_____/

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

Defendant Michael Anthony Hooks, Jr. ("Defendant") is charged with being a felon in possession of a firearm and ammunition based upon evidence seized from a vehicle during a traffic stop on January 17, 2022. Defendant has filed a Motion to Suppress ("Motion") seeking to suppress all direct and derivative evidence stemming from the warrantless search of the vehicle.

Defendant's Motion has been referred to me for a Report and Recommendation. I held an evidentiary hearing on August 29, 2023. For the following reasons, I find that the warrantless search of Defendant's car was justified under Fourth Amendment jurisprudence. Thus, I recommend that Defendant's Motion be **DENIED**.

## EVIDENTIARY HEARING

At the hearing, the Government presented testimony from four current and/or former officers from the Riviera Beach Police Department ("RBPD"): Officer Orlanzo Douglas,

Detective Tyler Cox, Officer Justin Hawkins,[1] and Officer Javares Harvey. The Government also submitted the following exhibits: (1) a flash drive containing the officers' body camera videos (Govt. Ex. 1)[2]; (2) Officer Hawkins' 2016 K-9 certification records (Govt. Ex. 2); and (3) Officer Hawkins' 2021 K-9 certification records (Govt. Ex. 3).

Defendant offered no witnesses, but submitted the following exhibits: (1) certified transcripts of excerpts from the officers' body camera videos (Def. Ex. A); (2) minutes of a court proceeding in the Fifteenth Judicial Circuit in and for Palm Beach County in Case No. 502022TR008137AXXXNB (Def. Ex. B); (3) a state court order in the Fifteenth Judicial Circuit in and for Palm Beach County in Case No. 502022TR008136AXXXNB (Def. Ex. C); (4) a copy of the traffic citation issued to Emily Hunter for the AS/1 violation and a copy of the docket sheet from Case No. 502022TR008137AXXXNB in the Fifteenth Judicial Circuit in and for Palm Beach County (Def. Ex. D); and (5) a copy of the traffic citation issued to Ms. Hunter for the rearview mirror obstruction violation and a copy of the docket sheet from Case No. 502022TR008136AXXXNB in the Fifteenth Judicial Circuit in and for Palm Beach County (Def. Ex. E).

## FINDINGS OF FACT

The following findings of fact are based on evidence presented at the evidentiary hearing. These factual findings are based, in part, on credibility determinations, after having observed all the witness testimony together with the other evidence presented. Except where otherwise noted, I find that all the witnesses testified credibly. *See U.S. v. Menendez*, 2000 WL

---

[1] Officer Hawkins was terminated from RBPD for reasons unrelated to this case. Tr. at 103. He is currently petitioning for reinstatement. *Id*.

[2] The flash drive includes Officer Hawkins' bodycam video (Govt. Ex. 1(a)), Officer Douglas' bodycam video (Govt. Ex. 1(b)), Officer Cox's bodycam video (Govt. Ex. 1(c)), Officer Hawkins' bodycam video (Govt. Ex. 1(d)) and Officer Harvey's bodycam video (Govt. Ex. 1(e)).

36733765, at *1 (S.D. Fla. Oct. 2, 2000) ("Rulings on motions to suppress involve mixed question of law and fact … [One] issue of fact … [is] the credibility of the witnesses.").

On the evening of January 17, 2022, police officers of the RBPD Active Criminal Enforcement Team were conducting high-visibility traffic stops in the Monroe Heights community of Riviera Beach, Florida. Tr. at 20, 55. The Active Criminal Enforcement Team is a proactive unit established to conduct high-visibility traffic stops in high-crime areas to deter violent crime and gang activity. *Id*. at 8, 20, 24, 55-56. Detective Cox and Officers Douglas, Hawkins, and Harvey were the officers on scene that night.

At approximately 11:16 P.M., as the officers were finishing up an unrelated traffic stop, a white Kia sedan drove past them traveling at approximately 20 to 25 miles per hour. Tr. at 25. It was dark outside, but body camera video shows two bright streetlights in the area. Govt. Ex. 1(a). The area was also lit by police patrol vehicles. *Id*.; Tr. at 10. The Kia sedan passed approximately 5 to 8 yards from the officers. Tr. at 50. Both Officer Douglas and Detective Cox were looking directly at the vehicle as it passed them. Govt. Ex. 1(a) at 23:16:18-26. The vehicle passed the officers within about three to five seconds. *Id*.; Tr. at 26. As it passed, Officer Douglas and Detective Cox observed that the tint on the front windshield appeared to be illegal. Specifically, under Florida law, sunscreen material on a vehicle's front windshield may not extend below the AS/1 line, which is an indicator placed by the manufacturer on the front window of every vehicle. Tr. at 57. Although Officer Douglas and Detective Cox could not see the AS/1 line itself, they saw the tint on the front windshield and believed it to be lower than the AS/1 line based on their training and experience.

Once the vehicle passed the officers, Officer Hawkins asked "Did it have tints?" Officer Douglas responded, "Yeah." Govt. Ex. 1(a) at 23:16:30-32; DE 38-1 at 5; Tr. at 13, 27. The

officers immediately entered their police vehicles, pursued the white Kia sedan, and initiated a traffic stop.

Officer Cox stopped the Kia sedan at a nearby Chevron gas station at approximately 11:17 PM. Govt. Ex. 1(c); Tr. 13-14, 75, 88. Officers Douglas, Hawkins, and Harvey arrived shortly thereafter as backup officers. Tr. at 62, 67, 70. As Officer Cox approached the vehicle, Defendant exited the vehicle from the front passenger side. Govt. Ex. 1(c) at 23:17:17-24; Tr. at 60. Officer Cox immediately instructed Defendant to get back inside the vehicle. *Id*. Officer Cox approached the driver's side and spoke to the driver, Ms. Emily Hunter. Govt. Ex. 1(c) at 23:18:00-28; Tr. at 58-59. He informed her that he stopped her for an illegal tint and taps on the front windshield to show her the tint is too low. *Id*. He asked her if there is anything illegal in the car, such as weapons, marijuana, cocaine, heroin, or meth, and she responded "no." *Id*. He obtained her license, registration and insurance information and returned to his vehicle to input her information into law enforcement databases. *Id*. He then tested the Kia sedan's side window with a tint meter and determined that it was illegally tinted as well. Govt. Ex. 1(c) at 23:20:00-45; Tr. at 63-65. He returned to his vehicle to continue running her information and write the citations. Govt. Ex. 1(c) at 23:21:00-23:23:19.

Officer Douglas approached the passenger side of the vehicle, where Defendant was seated. Govt. Ex. 1(b) at 23:18:00; Tr. 38-39. Officer Douglas instructed Defendant to get out of the vehicle and Defendant complied. Govt. Ex. 1(a) at 23:20:15; Tr. 38-39. As Defendant exited the vehicle, Officer Douglas observed a marijuana cigarette on the front passenger seat. Tr. at 16. Officer Douglas knew it was a marijuana cigarette based on its color and shape in a transparent roll containing marijuana leaf in such a manner as "to improvise a smoke." *Id*.

Detective Cox asked Officer Hawkins, who is a K-9 handler, to walk his dog, K-9 Perez, around the vehicle to conduct a free air sniff of the vehicle's exterior. Tr. at 62. K-9 Perez is certified by RBPD's K-9 program. To become certified, Officer Hawkins and K-9 Perez completed 480 hours of training, which included approximately three daily hours of training K-9 Perez to alert to the presence of drugs in boxes, vehicles, and rooms. Tr. at 109-110. Additionally, Officer Hawkins and K-9 Perez received certifications for tracking, patrol, and narcotics detection from the Florida Law Enforcement K-9 Association. Tr. at 113-16. K-9 Perez is trained to detect MDMA, marijuana, cocaine, heroin, and methamphetamine. Tr. at 111.

When Officer Hawkins walked K-9 Perez around the vehicle, K-9 Perez alerted to the presence of narcotics near the front driver's side door. Govt. Ex. 1(d) at 23:21:30 to 23:21:58; Tr. at 117. Based upon K-9 Perez' alert, Officers Hawkins and Douglas searched the vehicle and found a marijuana cigarette, a small baggie of marijuana and a firearm in the vehicle's glove box. Tr. 118-20. Defendant was arrested for possessing a firearm after being previously convicted of a felony.

Detective Cox documented that the front windshield tint extended below the AS/1 line by taking photographs. Govt. Ex. 1(c) at 23:24:00 to 23:25:00; Tr. at 66. He asked Officer Harvey to finish writing the traffic citations so he could transport Defendant to a holding facility. Tr. at 67.

On April 11, 2023, a federal grand jury returned an Indictment charging Defendant with being a convicted felon who knowingly possessed a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).

## ANALYSIS

Defendant makes four arguments for suppression. First, Defendant argues that he has standing as a vehicle passenger to bring a Fourth Amendment challenge regarding the legality of the traffic stop. Second, Defendant contends that the traffic stop violated his rights because it was solely pretextual and not based on probable cause or reasonable suspicion. Third, Defendant maintains that the search of the vehicle was illegal because law enforcement unreasonably extended the traffic stop in order to conduct a dog sniff for narcotics. Fourth, Defendant contends that the positive canine alert on his vehicle did not provide probable cause to search it.

The Government correctly concedes that Defendant has standing,[3] but counters that there was probable cause for the stop, the length of the stop was reasonable, and the positive canine alert provided probable cause to search the vehicle.

### A. The Traffic Stop was Supported by Probable Cause

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause.'" *U.S. v. Batson*, 749 F. App'x 804, 806 (11th Cir. 2018) (quoting U.S. Const. amend. IV). "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Illinois v. Rodriguez*, 497

---

[3] Although not disputed by the Government, I address as a threshold matter whether Defendant—as a passenger in Ms. Hunter's vehicle—has standing to bring his Fourth Amendment challenge to the traffic stop. Because a traffic stop "necessarily curtails the travel a passenger has chosen just as much as it halts the driver," a passenger is "seized" under the Fourth Amendment the "moment [the driver's] car [comes] to a halt on the side of the road." *Brendlin v. California*, 551 U.S. 249, 257 (2007). A "passenger therefore has standing to challenge a stop's constitutionality." *Arizona v. Johnson*, 555 U.S. 323, 332 (2009). Thus, Defendant may challenge the constitutionality of the traffic stop involving Ms. Hunter's vehicle.

U.S. 177, 183 (1990)).  The Supreme Court has "repeatedly affirmed" that "the ultimate touchstone of the Fourth Amendment is reasonableness."  *Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014).

A traffic stop is a seizure within the meaning of the Fourth Amendment, *Delaware v. Prouse*, 440 U.S. 648, 653 (1979), but is constitutional if it is supported by probable cause to believe a traffic violation has occurred or is justified by reasonable suspicion in accordance with *Terry v. Ohio*, 392 U.S. 1 (1968).  *U.S. v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008); *see also U.S. v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999).  Probable cause exists when, under the totality of the circumstances, there is a fair probability that illegal conduct has occurred.  *U.S. v. Sokolow*, 490 U.S. 1, 7 (1989); *U.S. v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986).  The probable cause standard is objective, and the officers' subjective motives in executing a traffic stop are irrelevant.  *Whren v. U.S.*, 517 U.S. 806, 813 (1996); *see also Simmons,* 172 F.3d at 775.

Under Florida law, driving with illegal tints is a traffic violation that provides a valid basis for a traffic stop.  *U.S. v. Pierre*, 825 F.3d 1183, 1192 (11th Cir. 2016) (citing Fla. Stat. § 316.2953); *see also State v. Moore*, 791 So.2d 1246, 1249 (Fla. 1st DCA 2001).  Florida law prohibits driving a motor vehicle that has a front windshield treated with sunscreening material that "encroaches upon the driver's direct forward viewing area as more particularly described and defined in Federal Motor Vehicle Safety Standards No. 205 as the AS/1 portion of the windshield." Fla. Stat. § 316.2952(2)(b).  The AS/1 line, which is placed on the vehicle by the manufacturer, is approximately four inches from the top of the windshield and it runs parallel across the windshield.  Tr. at 49.  Florida law permits front windshield tinting that ends above the AS/1 line but tinting that extends below the AS/1 line is not permitted.  *Id*. at 49, 54.

Here, the traffic stop was lawful because the officers had probable cause to believe the tint on the vehicle's front windshield violated Florida law. Both Officer Douglas and Detective Cox testified that, when the vehicle drove by them, they personally observed that the tint on the vehicle's front windshield appeared to extend below the AS/1 line. Defendant argues that the officers could not have seen the illegal tinting on Ms. Hunter's car because it was dark outside and the front of the car was visible to the officers for only 3 to 5 seconds making it impossible for them to have actually seen the AS/1 line. The officers did not need to see the AS/1 line itself, however; they needed only a reasonable belief that the vehicle's window tinting was in violation of the limits set forth by Fla. Stat. § 316.2952(2)(b). Both officers credibly testified that they could not see the AS/1 line on the vehicle as it passed by, but they could see, based on their training and experience,[4] that the tint extended farther than was permitted under Florida law.[5] The white Kia sedan, which was traveling around 20 to 25 miles per hour, passed a short distance of about "five to eight yards" away from the officers, who were both looking directly at the vehicle as it drove past them. Tr. 50. Although it was dark outside, the street was sufficiently lit by streetlights and police patrol vehicles. Officer Douglas testified that he saw the tint on the vehicle's front windshield "with his eye," and he perceived it to be in violation of the AS/1 line rule. Tr. 29-30, 51. Detective Cox also testified that he saw the front windshield's illegal tint as the car passed. When asked to explain how he was able visually to

---

[4] Officer Douglas has been an officer for eight years and has issued 50 to 75 citations for illegal window tint. Tr. at 31-32. Detective Cox has been in law enforcement for five years and has issued "well over a couple hundred" citations for illegal window tint. Tr. at 53, 55.

[5] Consistent with the officers' hearing testimony, evidence of record reveals that when the vehicle passed the officers, Officer Hawkins asked "Did it have tints?" Officer Douglas responded, "Yeah." Govt. Ex. 1(a) at 23:16:30-32; DE 38-1 at 5; Tr. at 13, 27. Both officers credibly and consistently testified at the hearing that, based on their training and experience with suspected tint violations, this exchange between them was short-hand for what they both understood to mean that the passing vehicle had illegal or unlawful tinting in violation of Florida law. Tr. 47-48; 93-96.

determine whether the vehicle violated the AS/1 rule, Detective Cox explained that based upon his experience "dealing with AS[/]1 line violations as well as looking at AS[/]1 lines on numerous vehicles," he knows that the AS/1 line is a little bit above where the rearview mirror is on a car, and he could see that the tint in this case was lower than the AS/1 line. Tr. 56-57. After the car was stopped, Detective Cox confirmed that the front window tint was in fact below the AS/1 line. Tr. at 57.

    I find the testimony by Officer Douglas and Detective Cox that they both saw the front windshield's tint as the vehicle drove past them and it appeared to them to be illegal to be credible and trustworthy. Their testimony was consistent, plausible, uncontroverted, and based on their experience issuing hundreds of traffic citations for illegal window tint presumably in all types of circumstances. Moreover, there was nothing about Officer Douglas or Detective Cox's demeanor on the stand that suggested deception; to the contrary, they were forthright, clear and concise, and looked at me directly when responding to questions. Their testimony is also buttressed by my own independent review of Officer Hawkins' body camera video. When the video is paused as Ms. Hunter's vehicle is approaching, I can see where the tint ends and it appears to extend lower than where the officers described the AS/1 line to normally be. Their testimony is further supported by the fact that subsequent inspection of the vehicle established that the windshield tint did in fact illegally extend beyond the AS/1 line. I therefore accept as credible Officer Douglas and Detective Cox's testimony regarding the circumstances surrounding the traffic stop.

    Defendant contends that the traffic stop was pretextual because the officers knew Defendant from prior encounters and were actually looking for drugs and guns as part of RBPD's Active Criminal Enforcement Team. This argument is unpersuasive. Officer Douglas

credibly testified that he did not recognize Defendant as the Kia sedan drove past them, and he had never had any interaction with the Defendant prior to January 17, 2022. Tr. at 10. Detective Cox credibly testified that he did not recognize Defendant when the car drove past, but he later recognized him from a prior arrest following a traffic stop in which Defendant unlawfully possessed a firearm. *Id*. at 57-58. Furthermore, the Supreme Court in *Whren* flatly rejected the idea that "the constitutional reasonableness of traffic stops depends on the actual motive of the individual officers involved." *Whren*, 517 U.S. at 813. As long as the circumstances, viewed objectively, justify the traffic stop, the officers' subjective motives do not strip them of their legal justification. *Id*. at 812-13. Based upon their observations, Officer Douglas and Detective Cox had a reasonable belief that the tint on the Kia sedan's front windshield was in violation of Florida's legal limits. As a result, the traffic stop was supported by probable cause and the officers lawfully stopped Defendant's vehicle. *Pierre*, 825 F.3d at 1192; *U.S. v. Gonzalez*, 2009 WL 3230787, at *7 (M.D. Fla. Oct. 2, 2009) (finding that the confirmed tint violation "demonstrates that [officer] had probable cause based upon his observation to believe the Defendant's tinting was" illegal under Florida law). Defendant's Motion on this basis should be denied.

### B. The Officers Did Not Unlawfully Prolong the Traffic Stop to Conduct a Dog Sniff

The duration of a traffic stop is limited to the time necessary to effectuate the purpose of the stop. *U.S. v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez v. U.S.*, 575 U.S. 348, 354 (2015) (citations omitted). "Authority for the

seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*. An officer does not unreasonably delay a traffic stop by engaging in inquiries such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. But the traffic stop may not last any longer than the time necessary to process the traffic violation unless there is "articulable suspicion of other illegal activity." *U.S. v. Holloman*, 113 F.3d 192, 196 (11th Cir. 1997).

Here, the officers' testimony and body camera video footage establish that the duration of the traffic stop was limited to the time necessary to process the traffic violation. The body camera video footage shows that the officers first saw Ms. Hunter's car at approximately 11:16 PM. Detective Cox stopped the vehicle at the Chevron gas station at 11:17 PM and spoke to the driver, Ms. Hunter, at approximately 11:18 PM. At 11:20 PM, Ms. Hunter and Defendant exited the vehicle and Detective Cox checked the side window using a tint meter. A few seconds later, Detective Cox returned to his patrol car to check law enforcement databases and process the traffic citations. At 11:21 PM, Officer Hawkins walked K-9 Perez around Ms. Hunter's vehicle to conduct an open-air dog sniff. K-9 Perez alerted to the presence of narcotics inside the vehicle at approximately 11:22 PM. Shortly thereafter, at 11:23 PM, Officer Hawkins found a small baggie of marijuana in the vehicle and a firearm in the glovebox. These circumstances occurred before Detective Cox finished writing the traffic citation. Indeed, as Defendant's Motion highlights, "*just 6 minutes*" passed from the time of the traffic stop to the time Defendant was in handcuffs following the discovery of the firearm. DE 18 at 6 (emphasis in original). There is no evidence that the officers delayed processing the traffic citation or unlawfully prolonged the traffic stop in any way. *See U.S. v. Braddy*, 11 F.4th 1298, 1312

(11th Cir. 2021) (finding no unreasonable delay where "[p]rior to the sniff, no additional time was added to the traffic stop other than necessary for conducting the routine records check necessary for the issuance of and preparation of a traffic citation").  Thus, Defendant's Motion on this basis should be denied.

### C. The K-9's Positive Alert was Reliable

Probable cause to search a vehicle exists when a narcotics-trained dog alerts to the presence of drugs in the vehicle.  *U.S. v. Dunkley*, 911 F.2d 522, 527 (11th Cir. 1990); *see also Braddy*, 11 F.4th at 1312.  The Supreme Court has rejected a "strict evidentiary checklist" for assessing a K-9's reliability.  *Florida v. Harris*, 568 U.S. 237, 244-45 (2013).  A "probable-cause hearing focusing on a dog's alert should proceed much like any other," and the relevant inquiry is whether "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime."  *Id.* at 247-48.  Evidence of "a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id.* at 246.  However, a defendant "must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. *Id.* "The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty." *Id.* at 247.  And even where "a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause, such as if the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." *Id.* (citations and quotations omitted)).

Here, the evidence submitted at the suppression hearing established that Officer Hawkins and K-9 Perez completed 480 hours of training to become certified under RBPD's K-9 program. Tr. at 107. Additionally, after completing the initial certification process, which included testing K-9 Perez under controlled settings, Officer Hawkins and K-9 Perez continued to perform weekly trainings on Wednesdays. Tr. at 112. Moreover, on June 1, 2016 and November 17, 2021, Officer Hawkins and K-9 Perez received certifications for tracking, patrol, and narcotics detection from the Florida Law Enforcement Canine Association. Govt. Exs. 2 and 3. This evidence supports the conclusion that K-9 Perez's alert for narcotics on the vehicle reliably indicated the presence of drugs within the vehicle. Indeed, the officers' testimony and bodycam footage establish that the officers found marijuana—which K-9 Perez was trained to detect—inside the vehicle. Accordingly, I find that the officers had probable cause to search the vehicle based upon K-9 Perez's alert. *Harris*, 568 U.S. at 248 ("If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause."); *U.S. v. Young*, 2016 WL 11431025, at *4 (S.D. Fla. Nov. 8, 2016) (finding "dog was sufficiently qualified to detect the drugs in Defendant's car" where "the dog completed three months of narcotic detection training . . . [and] was certified in narcotics detection from the Florida Law Enforcement Canine Association."). Defendant's Motion on this basis should be denied.

## **RECOMMENDATION**

Based on the foregoing, I respectfully recommend that Defendant's Motion to Suppress, DE 18, be **DENIED** in its entirety.

**NOTICE OF RIGHT TO OBJECT AND SHORTENED OBJECTIONS PERIOD**

Given the swiftly-approaching trial date and in the interest of promoting judicial economy and finality to the parties, a prompt resolution of this Report and Recommendation is required. As such, I find it necessary and appropriate to shorten the time for any objections pursuant to Southern District of Florida Magistrate Judge Rule 4(a). Accordingly, the parties shall have **SEVEN (7) DAYS** from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with U.S. District Judge Rodney Smith. *See* 28 U.S.C. § 636(b)(1)(C); S.D. Fla. Mag. J. R. 4(a). Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016). **Conversely, if a party does not intend to object to this Report and Recommendation, then that party shall file a Notice of such within THREE (3) DAYS of the date of this Report and Recommendation.**

**DONE AND RECOMMENDED** in Chambers at Fort Pierce, Florida, this 3rd day of October, 2023.

_____
SHANIEK MILLS MAYNARD
U.S. MAGISTRATE JUDGE